## UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| In re: GREGORY W. RICKER, | : | **Bky. No. 10-10069 ELF** |
| ———————————————— | : | |
| | : | |
| OPPENHEIMER & CO. INC., | : | **Chapter 7** |
| | : | |
| Plaintiff, | : | |
| v. | : | |
| | : | |
| GREGORY RICKER, | : | **Adv. No. 10-0124** |
| | : | |
| Defendant. | : | |

# M E M O R A N D U M

## I. INTRODUCTION

In November 2008, Oppenheimer & Co. Inc. ("Oppenheimer") hired Gregory Ricker ("the Debtor") as a stockbroker. As is customary in the securities industry, Oppenheimer extended to the Debtor a substantial hiring "bonus" in the form of a forgivable loan ("the Oppenheimer Loan"). The Oppenheimer Loan was for $349,652.00. The loan agreement provided that the principal amount would be discharged in increments over five (5) years so long as the Debtor remained employed with Oppenheimer, but obligated the Debtor to immediately repay the full remaining balance on the loan if his employment terminated for any reason during the five (5) year term.

The Debtor resigned his employment with Oppenheimer on August 14, 2009, less than one (1) year after accepting the loan. This was not the first time the Debtor had taken out forgivable loans and resigned his employment before the loan was forgiven. He had similar forgivable loans from his four (4) previous employers, only to resign from each of those

positions, for various reasons, before the "forgiveness" term prescribed in the agreements.  In

each prior case, the Debtor either negotiated a reduced pay-off amount or did not repay any of

the unpaid loan before filing this bankruptcy case.

The Debtor filed a voluntary Chapter 7 bankruptcy petition on January 5, 2010, four and

one-half (4 ½ ) months after leaving Oppenheimer.  At that time, he owed Oppenheimer

$335,374.59.

Oppenheimer filed an adversary complaint on April 6, 2010 requesting that the

$335,374.59 loan balance be determined non-dischargeable pursuant to 11 U.S.C.

§523(a)(2)(A).[1]  Oppenheimer claims that the Debtor fraudulently entered into the Oppenheimer

loan intending neither to remain in their employ long enough to have his loan forgiven nor to

repay the loan.  The Debtor filed an Answer to the Complaint on May 17, 2010.  The Debtor

maintains that he intended to repay the Oppenheimer Loan when he entered into the transaction

but that subsequent escalating financial difficulties and stress-related health problems forced him

to leave the firm.

Trial of this adversary proceeding was held on April 8, 2011.  The parties declined to

submit post-trial briefs.

For the reasons set forth below, I determine that the debt is dischargeable under

§523(a)(2)(A).  Therefore, I will enter judgment in favor of the Debtor and against

Oppenheimer.

---

[1]    Oppenheimer's Complaint also set forth claims under 11 U.S.C. §§ 523(a)(6) and
§727(a)(5).  At trial, Oppenheimer abandoned both of these claims.

## II.  FINDINGS OF FACT

This adversary proceeding presents no unsettled legal issues and most of the facts are not in dispute.  The central factual dispute between Oppenheimer and the Debtor lies primarily in the inferences the court must draw regarding the Debtor's state of mind when he accepted the Oppenheimer Loan.

In resolving the factual issues, I have considered the totality of the evidentiary record, including the credibility and plausibility of the testimony (with associated demeanor evidence), as well as the documentary evidence admitted at trial.  Where appropriate, I have detailed in footnotes the reasons why I have resolved credibility issues in a particular way or drawn inferences from the evidence presented.

Based upon the testimonial and documentary evidence produced at trial, I make the following findings of fact.

### A.  Forgivable Loan

At the time of this trial, the Debtor had been employed as a securities broker for 13 years. (N.T. 10:54:06; 9:31:34).[2]  According to the parties, it is fairly common in the industry for a brokerage firm to provide newly hired brokers with a signing bonus structured as a forgiveable loan.[3]  (N.T. 9:32:00).  Under the five (5) year Oppenheimer note, for example, for each year of employment, one-fifth (1/5) of the loan was to be treated as paid.  (Ex. 6, ¶1).  If the the Debtor

---

[2]        The trial was not transcribed.  The numbers following the term "N.T." refer to the time of day of the testimony as identified in the digital recording of the hearing.

[3]        In this opinion, I generally will refer to these advances as forgivable loans.

had remained employed at the firm for the full five term of the loan, then the entire loan amount

would have been satisfied.  (Id.).  Because, however, the Debtor left Oppenheimer early, the full

amount of the loan not yet forgiven became due immediately.  (Id. at ¶2).


### B.  Debtor's Employment History

#### 1.  Raymond James:  October 1998 to June 2002

In October 1998, the Debtor began work at the brokerage firm Raymond James.  (N.T.

9:31:40).  The Debtor was given an $80,000.00 loan at the start of his employment with the firm.

(N.T. 9:31:50).  While the record is not clear as to the exact conditions, the Debtor did sign a

promissory note at the time that provided for both a specific term of employment and that

portions of the $80,000.00 amount would be forgiven on an annual basis.  (N.T. 9:32:00 –

9:33:00).

The Debtor resigned from his position at Raymond James in June 2002 (before the

expiration of the term specified in the promissory note), after having a series of "disagreements

with [his] manager."[4]  (N.T. 9:33:00 – 9:35:30).  Notwithstanding the fact that he signed an

agreement providing for annual forgiveness on the Debtor's anniversary date at the firm, the

Debtor believed that fairness and industry custom allowed for the amount to be prorated on a

monthly basis.  (N.T. 9:38:30).[5]  Consequently, the Debtor hired an attorney to help him

---

[4]     The Debtor did not elaborate on the nature of the disagreements prompting him to resign
from the firm and was not pressed to do so by the Plaintiff's counsel.

[5]     For example, in connection with a five (5) year forgivable loan, if a broker left a firm
after 18 months, 30% of the loan would be forgiven if the forgiveness is pro-rated on a monthly basis, as
opposed to a 20% forgiveness based on an annual calculation.

negotiate a monthly proration with Raymond James, which the Debtor believed reflected his time at the firm more precisely.  (N.T. 9:35:30).  Raymond James agreed to this rate and the Debtor subsequently paid the negotiated amount in full.  (N.T. 9:35:30).[6]

## 2.  Janney Montgomery Scott:  June 2002 to October 2004

After leaving Raymond James, the Debtor began working for the brokerage firm Janney Montgomery Scott ("Janney") in June 2002.  (N.T. 9:41:50).  The Debtor accepted another up-front, forgivable loan of $80,000.00, and signed a promissory note providing for a specific term of employment with annual forgiveness on the Debtor's anniversary dates. (Id.).  The Debtor resigned from the firm in October 2004  –  again, before the term specified in the promissory note. (N.T. 9:45:55). He subsequently enlisted the help of an attorney to negotiate for the amount of the loan repayment on terms that prorated the Debtor's obligation on a monthly basis.[7]  (N.T. 9:47:30).  Janney consented and the Debtor repaid the full negotiated amount.  (N.T. 9:47:20).

---

[6]      Oppenheimer and the Debtor disagree as to whether it is industry custom for loans to be pro-rated on a monthly or yearly basis.  The Debtor asserts that industry custom is to pro-rate the loan amount on a monthly basis.  As discussed below, the Debtor successfully negotiated monthly pro-rated payoffs when he left two (2) of his employers.  On the other hand, Oppenheimer points out that four (4) of the five (5) loans referenced in the record  specified that loan amounts would be forgiven on a yearly basis; only one (1) of the loans provided expressly for monthly pro-rating.  If monthly pro-ration was not the uniform industry custom, negotiating with an employer to reduce amounts owed based on a monthly formula was at least an accepted possibility, as evidenced by the resolution of the Debtor's first two (2) loan agreements.  More to the point, however, I conclude that a finding in favor of either party is not especially probative of the Debtor's alleged fraudulent intent at issue in the case, so I make no finding on this factual issue.

[7]      The record was not developed regarding the Debtor's reasons for leaving Janney.

### 3.  Wachovia: October 2004 to June 2007

The Debtor commenced employment with Wachovia in October 2004.  (Ex. 1; N.T.

9:46:00).  Wachovia gave the Debtor a $280,540.00 forgivable loan, payable in monthly

installments over sixty-four (64) months, with the option of automatic payroll deductions.  (Ex.

1).  If the Debtor's employment at Wachovia ended "for any reason or no reason" before the loan

term expired, the Debtor would be in default under the agreement and all unpaid amounts would

become immediately due and payable.  (Id.).  The Debtor acknowledged that he was aware of

these terms.  (N.T. 9:49:45- 9:50:28).

Once again, the Debtor left his position with this employer prior to the expiration of the

loan term.  According to the Debtor, when he left, he was certain that Wachovia had violated the

terms of his Employment Agreement. (See N.T. 10:57:35 – 11:07:10).

First, when his paycheck was less than he expected, the Debtor became aware that

Wachovia had a policy of levying "ticket charges"  –  essentially, fees imposed on brokers for

making trades  –  that dramatically reduced his compensation.  (See N.T. 10:57:45 – 11:00:08).

This upset the Debtor because he perceived such a policy to be out of the ordinary and he

claimed that he was unaware of the policy before he began working at Wachovia.  (Id.).

Compounding the problem was the fact that Wachovia began pressuring its brokers, the

Debtor included, to promote and sell Wachovia investment products to their customers.  (N.T.

11:00:31).  The Debtor claims that this practice was contrary to oral representations made to him

at the outset of his employment  –  specifically, representations that he would be permitted full

discretion as to what securities he would recommend and sell to his clients. (N.T. 9:52:21-

9:52:37).  When the Debtor refused to promote the loan and mortgage products ( believing them

to be inferior and ill-suited to the needs of his clients), the Debtor claims that his supervisors began to "pressure" or "harass" him to do so.  (N.T. 11:00:08 – 11:01:22).

In addition, the Debtor testified that he was denied a performance bonus that he felt was owed to him that would have amounted to several hundred thousand dollars.  (N.T. 11:04:40 – 11:04:48).[8]

Finally, the Debtor became upset when his wife found an e-mail between two Wachovia managers discussing what the Debtor considered to be false and outrageous allegations that the Debtor had commenced an affair with a client's daughter.  (N.T. 11:05:00 - 11:06:00).  The Debtor confronted his manager about the e-mail and demanded some sort of redress, only to have his complaint summarily dismissed.   The manager's response incensed the Debtor.  (N.T. 11:06:52 – 11:07:47).

During his tenure at Wachovia, the Debtor began to experience financial difficulties. (N.T. 9:54:00 – 9:54:10).  The Debtor dissipated his Wachovia forgivable loan quickly. (N.T. 9:54:00 – 9:56:45).  He used $80,000.00 to pay his $80,000.00 debt to Janney. (Id.)  He also used a substantial portion of his loan to make trades on the securities markets for his personal benefit and lost all of that money.  (N.T. 9:59:24 – 9:59:30).  He spent the remainder of the loan proceeds on miscellaneous expenses associated with maintaining and developing his business. (9:58:00 – 9:59:27).[9]  The Debtor began to accumulate debt to finance his expenses.  (N.T.

---

[8]        The Debtor claims that Wachovia had inserted a clause into his employment agreement that permitted a performance bonus only if the amount of the Debtor's total commissions in a given year was 1.5% of the amount of his total sales, or less.  (N.T. 11:02:50 - 11:04:33).  At the time he signed the agreement, the Debtor did not appreciate the consequences of the provision.  Because the Debtor routinely sold products at a commission of 5% or more, however, this clause effectively deprived him of the possibility of obtaining any performance bonus.  (N.T. 11:04:40 - 11:04:48).

[9]        The Debtor explained that although he is an employee of the brokerage firms at which he works, he incurs certain expenses associated with servicing and growing his client base for which he is

(continued...)

11:09:24 – 11:09:50; 9:56:45 – 10:00:00).  When his debts mounted, the Debtor concluded that

he could not afford to remain at Wachovia. (N.T. 11:09:25 – 11:09:50).

The Debtor resigned from Wachovia in June 2007, taking the position that he was not

obligated to pay any portion of the Wachovia loan (at that time, $187,144.00) due toWachovia's

breaches of his employment agreement.  (N.T. 09:56:45 – 10:04:30).  Wachovia subsequently

pursued its loan claims against him via arbitration. (N.T. 10:02:20 – 10:03:00; N.T. 10:06:45 –

10:06:57).

### 4.  RBC Dain Rauscher: June 2007 to November 2008

Upon resigning from Wachovia, the Debtor immediately accepted a position at RBC

Dain Rauscher ("RBC") in June 2007.  (N.T. 9:56:50).  He received another forgivable loan, in

the amount of $395,286.00, with a six (6) year forgiveness term.  (Ex. 2 ¶1 ("RBC Promissory

Note"); Ex. 3 ¶3(a)(i) ("RBC Employment Agreement")).  The RBC bonus was forgivable on a

monthly basis.  (Ex. 2 ¶1).  The agreement was similar to others in that if the Debtor ceased to be

employed by RBC for any reason, whatever portion of the bonus that had not been forgiven

would become immediately due and payable. (Compare Ex. 2, ¶4, with Ex. 6, ¶2).

The Debtor testified that the day before he was to begin work at RBC, the Debtor's

manager gave him a copy of an employment agreement to review.  (N.T. 11:16:30 – 11:16:45).

When the Debtor reviewed the agreement, he noticed that RBC had included a term regarding

---

[9](...continued)
not reimbursed by his employer.  (N.T. 12:11:15 – 12:11:36).  To that end, the Debtor paid for the
services of a "broker coach" to help the Debtor manage his time and to develop his speaking skills and
spent "tons and tons and tons of money" on advertising, dinners and seminars in an effort to bring in new
clients and thus, increase his income.  (N.T. 11:09:24 – 11:09:50; 12:07:00 – 12:09:08).  The Debtor
presented no documentation corroborating these expenses.  Nonetheless, I credit his testimony on this
point as it struck me as fully plausible.

his commission-to-sales ratio identical to that which deprived him of the opportunity to earn an annual bonus at Wachovia (described in note 8, _supra_).  (N.T. 11:16:48).  The Debtor protested and asked that the provision be removed from the agreement, but was told by his manager that the term was a standard part of all RBC agreements with brokers and that it could not be removed.  (N.T. 11:18:00).  However, the manager assured the Debtor that RBC did not strictly observe the term, that other RBC brokers received their bonuses despite having the term in their agreements and that the Debtor would receive whatever performance bonus he might earn.  (N.T. 11:20:10 – 11:21:10).  At this point, the Debtor had already transferred his clients to RBC and thus felt that he could not back out of the transfer without both losing face to his clients and returning to an untenable situation at Wachovia.  (N.T. 11:17:15 – 11:17:35).  Based on the assurances he received from the manager and his inability to reverse his departure from Wachovia, the Debtor signed the employment agreement.  (N.T. 11:17:48).[10]

On June 1, 2007, the day after the Debtor began work at RBC, Wachovia sent a letter demanding that the Debtor immediately pay $187,144.00 due on the note he had signed at the start of his employment there.  (_See,_ Ex. 4).  The Debtor passed the letter to his attorney and took no further action.  (N.T. 10:12:50 – 10:13:10).  The Debtor did not use or set aside any portion of his RBC forgivable loan to repay Wachovia.  (N.T. 10:11:40 – 10:12:00).  Instead, he placed his bonus funds into a personal trading account at RBC.  (N.T. 10:14:00 – 10:14:10).

---

[10]      I would be more skeptical of the veracity of the Debtor's testimony on his transition from Wachovia to RBC but for the additional details he offered explaining his seemingly irrational willingness to sign another employment contract containing the same clause as the one that engendered his problems with Wachovia.

The Debtor used his RBC loan to pay a tax bill of approximately $40,000.00 and business expenses amounting to $60,000.00 to 70,000.00 annually, including: his broker coach, advertising to attract new clients and monthly news services.  (N.T. 12:10:40 - 12:12:12).  He lost the remainder of the RBC loan (approximately $280,000.00) in "day trading."  (N.T. 12:10:20 – 12:12:12).[11]  When the loan money ran out, the Debtor continued to finance his ongoing expenses by incurring debt.[12]

The Debtor's performance at RBC was at least satisfactory because he doubled his previous year's commissions in his first year at the firm.  (N.T. 11:23:20).  Despite this success, however, a dispute arose between the Debtor and RBC over the payment of a performance bonus.  (N.T. 11:15:10 – 11:15:30).

When the Debtor's one year anniversary at the firm passed, he felt that he was owed a performance bonus of $300,000.00 - $400,000.00.  (N.T. 11:23:40 – 11:23:50).  Several weeks after the Debtor raised the issue, his manager informed him that, contrary to the prior assurances, the Debtor would not be receiving a bonus based on the application of the commission-to-sales ratio provision in his employment agreement.  (N.T. 11:24:10 – 11:24:50).  The Debtor made various complaints up the chain of command about the withholding of his bonus. (Id.)  The firm responded by freezing all of the Debtor's accounts such that he was unable to make trades on behalf of his clients.  (N.T. 11:24:50 – 11:25:42).  The Debtor concluded that RBC was attempting to force him out, leaving him no choice but to find other employment.  (N.T.

---

[11]      The Debtor explained that his "day trading" consisted of risky trades of options on the securities markets in an attempt to turn fast profits.  (N.T. 11:53:08 – 11:55:05).

[12]      Before beginning his employment at Oppenheimer, the Debtor had accumulated, over an unknown period of time, approximately $80,000 in multiple lines of credit, $35,000 in credit card debt, and owed approximately $100,000 to family members. (N.T. 10:18:00 -- 10:18:40).  In his bankruptcy schedules, the Debtor listed substantially in excess of $100,000.00 in credit card debt.

11:26:15 – 11:26:30; N.T. 11:26:35 – 11:26:55).  He resigned in November 2008. (Joint Pre-

Trial Statement ¶8(e)).

Because he was, once again, leaving an employer before his loan was "forgiven," the

Debtor believed that RBC's actions would provide him a defense to repayment in any legal

proceeding, i.e., that RBC had breached its employment agreement with him by denying a bonus

and freezing his accounts.  (N.T. 11:26:35 – 11:26:55).

On May 20, 2008, during his tenure at RBC, Wachovia filed an arbitration claim against

the Debtor to compel repayment of the $187,144.00 unforgiven balance remaining on his loan

when he resigned from that firm.  (See, Ex. 18).  The Debtor hired counsel and responded to the

arbitration claim on July 17, 2008.  (Id.).  No hearing regarding the Wachovia arbitration had

been held when the Debtor resigned from RBC in November 2008.

Pursuant to the terms of the RBC Note, $307,902.60 became due when the Debtor

resigned in November 2008.  (See, Ex. 2 ("RBC Note"); Ex. 7 ("RBC Demand Letter")).

### 5.  Oppenheimer: November 2008 to August 2009

The Debtor moved to Oppenheimer immediately after resigning from RBC in November

2008. (Joint Pre-trial Statement ¶2).  The Debtor initiated transfer discussions with Oppenheimer

by calling Michael Neft ("Neft"), an account manager he knew when he worked at Janney, who

had since moved on to similar position at Oppenheimer.  (N.T. 11:27:05).  The Debtor

negotiated the terms of his employment at the firm during a series of meetings with Neft and

others in Oppenheimer management over two (2) to three (3) weeks.  (N.T. 12:33:00 –

12:34:30).  These negotiations included discussions regarding the Debtor's employment history,

the Debtor's resignation from at least some of his prior employers before the term specified in

his bonus agreements and Wachovia's pending arbitration claim attempting to recover amounts due to them by virtue of the Debtor's early departure. (N.T. 11:32:00 – 11:37:00).

The Debtor's employment agreement with Oppenheimer provided, once again, for a bonus structured as a forgivable loan, this time in the amount of $349,652.00, forgivable in five (5) yearly increments, and for a performance bonus to be paid shortly after his one (1) year anniversary at the firm. (Joint Pretrial Statement ¶ 3; Ex. 6 (Oppenheimer Note); N.T. 11:38:38 – 11:39:00).[13]  If the Debtor ceased to be employed by Oppenheimer for any reason during the five (5) year term, the amount not yet forgiven would become due and payable. (See Ex. 6).

The Debtor spent the entire $349,652.00 Oppenheimer bonus before leaving Oppenheimer and accounted for the money approximately as follows:

    (1)    $100,000.00 to repay personal loans from his mother and brother;

    (2)    $50,000.00 to pay down various lines of credit;

    (3)    $80,000.00 to cover losses he suffered in the day trading in which he continued to engage in an effort to extract himself from his worsening financial predicament;[14]

    (4)    $15,000.00 – 20,000.00 in legal expenses in defending the Wachovia arbitration case;

---

[13]     The employment agreement between the Debtor and and Oppenheimer was not introduced into evidence. However, Oppenheimer did not question the veracity of the Debtor's assertion regarding the terms of the employment agreement. In any event, the Debtor's testimony was probative and credible regarding his state of mind: shortly before he left the firm, he believed that an annual bonus would be due to him shortly thereafter. The Debtor estimated that, based on his performance while at Oppenheimer, this bonus would likely amount to "another couple hundred thousand" dollars. (N.T. 11:38:88 – 11:39:00).

[14]     Even as his debts continued to pile up and yet another large bonus evaporated, the Debtor testified that he always believed that the market would improve and that he would be able to "trade [himself] out of the mess [he] was in." (N.T. 11:53:00 – 11:53:06; 11:55:00; 12:47:10 – 12:48:00).

   (5)  $10,000.00 each month to cover the shortfall between his monthly income and expenses.[15]

(See N.T. 12:12:19 – 12:14:03).

  Upon commencing his employment with Oppenheimer, the Debtor received a demand letter from RBC for payment of the $307,902.60 balance due under the RBC Note.  (Ex. 7).  RBC also filed an arbitration complaint shortly thereafter on December 3, 2008.  (Ex. 8;  N.T. 11:14:25).

  The Debtor testified that although he continued to enjoy some measure of professional success while at Oppenheimer, his financial situation did not improve.  (See N.T. 11:37:30 – 11:39:50).   The "last straw," from the Debtor's perspective was the adverse decision he received in the Wachovia arbitration.  (N.T. 11:39:00 – 11:39:50).  The arbitration hearing was held on May 19, 2009.  (Ex. 18 at 2).  The panel rejected all of the Debtor's defenses and awarded Wachovia $201,870.00, the full amount it requested, plus interest.  (Id.).

  As a result of the arbitration award, the Financial Industry Regulation Authority ("FINRA") notified the Debtor that his brokerage license would be suspended unless he either paid the Wachovia award in full or entered into a payment agreement with the firm.  (Ex. 20; N.T. 11:44:20 – 11:45:10).  The Debtor testified that, at that point, he knew there was no way he could pay his way out of debt and the "walls started closing in."  (N.T. 11:39:25 – 11:39:45).  To buy some time and maintain his license, the Debtor negotiated a settlement with Wachovia ("Wachovia Settlement Agreement").  (Ex. 21; N.T. 11:45:07; N.T. 11:46:50 -- 11:47:36).  The Wachovia Settlement Agreement required the Debtor to make monthly payments through

---

[15]  The Debtor used his firm account both to make trades for his personal benefit and to pay bills and living expenses.  (N.T. 12:01:55 – 12:01:14).

-13-

October 2014, with an initial payment of $10,000.00 on December 2, 2009. (Ex. 21; N.T. 11:46:50 - 11:47:10).[16]

The Debtor testified that all of the stress he experienced in his job and personal finances after he lost the Wachovia arbitration caused his health to take a frightful turn for the worse. (N.T. 11:40:00 – 11:42:58). The Debtor began experiencing depression, anxiety attacks and bouts of sleeplessness for which he had to resort to medication. (N.T. 11:40:00 – 11:40:14). The Debtor believed he was on the verge of a nervous breakdown and began seeing a therapist. (N.T. 11:49:50). The Debtor also made two trips to a hospital emergency room between May and July 2009 after "throwing his back out." (N.T. 11:40:18 – 11:40:43). The Debtor attributed both of these "agonizing" injuries to his anxiety.[17] (N.T. 11:40:50 – 11:40:55).

After making his second trip to the hospital emergency room in two months, the Debtor determined that he "couldn't live like this anymore" and resigned from Oppenheimer on August 14, 2009, nine (9) months into the five (5) year term prescribed in the Oppenheimer Note. (N.T.

---

[16]      The Debtor failed to make even the initial payment on the Wachovia Settlement Agreement. (N.T. 12:01:35 – 12:02:00).

[17]      The only evidence on this aspect of the case came in the form of the Debtor's testimony. He produced no medical documentation to substantiate his claims. Oppenheimer, however, presented no evidence to contradict the Debtor's account. It attempted to deal with the Debtor's testimony in this area by arguing that the Debtor's medical problems simply coincided with a premature departure from the firm that the Debtor intended from the outset of the contractual relationship. (N.T. 3:33:33 – 3:34:59).

      I recognize that the Debtor's uncorroborated testimony was self-serving. Had there been some evidence to suggest that the Debtor's alleged health issues were nonexistent, or even exaggerated, I may well have drawn a substantial negative inference regarding the Debtor's overall credibility. In the absence of any such evidence, and believing it eminently plausible that the Debtor's situation following the entry of the Wachovia arbitration award was sufficiently stressful to induce the significant health problems the Debtor described, I find the Debtor's testimony on this point credible, albeit with some reluctance.

11:49:35 – 11:49:46; Joint Pretrial Statement ¶ 4).  No portion of his Oppenheimer bonus had

been forgiven and the full $349,652.00 became due.  Id.

**6.  Gunn Allen & Aegis Capital Group: August 2009 to April 2011 (trial date)**

Later in August 2009, almost immediately after leaving Oppenheimer, the Debtor began

working at Gunn Allen.  (N.T. 12:46:23).  The Debtor described Gunn Allen as an independent

brokerage firm much smaller than any of the Debtor's previous places of employment.  (N.T.

11:50:06).  The Debtor regarded a switch to a smaller firm (and the lifestyle changes that a

smaller firm represented) as the only way that he could remain in the business.[18]  (See N.T.

12:44:52 – 12:45:45; See also 11:49:42 – 11:50:23).  Gunn Allen gave the Debtor another

forgivable loan, this time in the amount of $50,000.00, for the purpose of opening his own local

office.  (N.T. 11:50:28 – 11:50:40).

**C.  The Bankruptcy Filing and Thereafter**

The Debtor did not make the first $10,000.00 payment due on December 2009 under the

Wachovia Settlement Agreement.  (Ex. 21 at 4; N.T. 12:01:35 – 12:02:00).  The Debtor chose to

file this bankruptcy case on January 5, 2010 as part of his effort to forestall and prevent the

suspension of his license by FINRA.  (Joint Pre-trial Statement at 3).

In March 2010, shortly after the bankruptcy filing, Gunn Allen ceased operations. (N.T.

11:57:00 – 11:57:32).  The Debtor found a new position with another independent firm, Aegis

---

[18]        The Debtor expected that working for a smaller independent firm would provide greater
work-life balance.  He would no longer be required to report to work at an office (and therefore would not
have to commute).  He would have the freedom to set his own hours and could spend more time with his
children.  He would not have sales quotas or be asked to sell or market specific investment products to his
clients or be supervised by a manager.  And, he was given a higher proportion of his commissions.  (N.T.
11:51:13; 12:44:52 – 12:45:45).

Capital Group ("Aegis") that same month.  (N.T. 12:46:20).  The Debtor remained employed at

Aegis at the time of trial. (N.T. 11:57:40 – 11:57:44).

### III.  NON-DISCHARGEABILITY UNDER 11 U.S.C. §523(a)(2)(A)

One of the chief purposes of the Bankruptcy Code is to provide honest debtors with a

"fresh start," free from the "weight of oppressive indebtedness."  In re Cohn, 54 F.3d 1108, 1113

(3d Cir. 1995); In re Feld, 203 B.R. 360, 365 (Bankr. E.D. Pa. 1996).  To this end, exceptions to

discharge are interpreted narrowly against creditors and liberally in favor of debtors.  Cohn, 54

F.3d at 1113; In re Giquinto, 388 B.R. 152, 164 (Bankr. E.D. Pa. 2008); Feld, 203 B.R. at 365.

The burden of proof in a non-dischargeability proceeding is on the person seeking to deny a

discharge and must be established by a preponderance of the evidence.  Grogan v. Garner, 498

U.S. 279, 286 (1991).

Oppenheimer bases its non-dischargeability claim on 11 U.S.C. §523(a)(2)(A), which

states:

> (a)    A discharge under section 727, 1141, 1228(a), 1228(b), or
> 1328(b) of this title does not discharge an individual debtor from
> any debt—
>
>         .  .  .
>
> (2)    for money, property, services, or an extension,
> renewal, or refinancing of credit, to the extent obtained,
> by—
>> (A)    false pretenses, a false representation, or
>> actual fraud, other than a statement respecting the
>> debtor's or an insider's financial condition; . . .

Section 523(a)(2)(A) provides three (3) grounds for nondischargeability: "false

pretenses," "false representations," and "actual fraud."  Courts have noted a distinction among

these grounds.  See, e.g., In re August, 448 B.R. 331, 349-50 (Bankr. E.D. Pa. 2010); Giquinto,

388 B.R. at 165 n. 26 (citations omitted); see also 4 Collier on Bankruptcy ¶523.08[1][d], [e]

(Alan N. Resnick, Henry J. Sommer eds., 16th ed. 2009).

Courts have regarded "false representations" as involving affirmative statements that are

false or misleading.  See Giquinto, 388 B.R. at 165 n. 26.  "False pretenses," on the other hand,

entail implied misrepresentations, omissions, or failures to disclose material facts that create a

false impression which is known to the debtor.  August, 448 B.R. at 349.  As for "actual fraud,"

some courts have held that the term refers to conduct other than classic factual

misrepresentations, which involve "any deceit, artifice, trick, or design involving direct and

active operation of the mind, used to circumvent and cheat another."[19]  Other courts, however,

have held the statutory term "false pretenses, a false representation, or actual fraud" is a term of

art encompassing only those species of fraud involving misrepresentation of fact.[20]

Oppenheimer's Complaint refers to all three (3) phrases found in §523(a)(2)(A), "false

pretenses, pursuant to false representation, and/or by actual fraud."  However, its fundamental

argument at trial was that the Debtor induced the firm to extend him a bonus through false

pretenses or representations regarding his intent to either remain at the firm or else to repay the

resulting debt.  For this reason, I will analyze Oppenheimer's allegations as a claim of false

---

[19]      See McClellan v. Cantrell, 217 F.3d 890, 893 (7th Cir. 2000) ("Fraud is a generic term,
which embraces all the multifarious means which human ingenuity can devise and which are resorted to
by one individual to gain an advantage over another by false suggestions or by the suppression of truth."
(quoting Stapleton v. Holt, 250 P.2d 451, 453-54 (Okla. 1952))); In re Vitanovich, 259 B.R. 873, 877
(B.A.P. 6th Cir. 2001) ("We adopt the position . . . that actual fraud as used in 11 U.S.C. § 523(a)(2)(A) is
not limited to misrepresentations and misleading omissions."); In re Barber, 281 B.R. 617, 624 (Bankr.
W.D. Pa. 2002)(citing In re Vitanovich, 259 B.R. 873, 877 (B.A.P. 6th Cir. 2001).

[20]      See In re Lewis, 2010 WL 1379770, at *4 (Bankr. E.D. Tex. Mar. 30, 2010); In re
Woodford, 403 B.R. 177, 186-89 (Bankr. D. Mass. 2009).

representation or false pretenses.[21]  The elements required to prove each are similar.  <u>August</u>, 448

B.R. at 350.

False pretenses and false representations under 11 U.S.C. § 523(a)(2)(A) are construed in

accordance with the general common law of torts.  <u>See</u> <u>Field v. Mans</u>, 516 U.S. 59, 70 n.9

(1995).  In order for a debt to be declared non-dischargeable under §523(a)(2)(A) based on false

pretenses or false representations, a plaintiff must prove that:

1.  the Debtor expressly or impliedly made a false representation;

2.  at the time of the representation, the Debtor knew, or believed, it was false;

3.  the false representation was made with the intent and purpose of deceiving the
creditor;

4.  the creditor justifiably relied upon the representation; and

5.  the creditor sustained damage as a proximate result of the misrepresentation.

<u>E.g.</u>, <u>In re Ritter</u>, 404 B.R. 811, 822 (Bankr. E.D. Pa. 2009); <u>Feld</u>, 203 B.R. at 365.

A debtor's use of funds extended on credit qualifies as an implied representation that the

debtor intends to repay the debt.  <u>See</u> <u>Ritter</u>, 404 B.R. at 824-25 (use of credit cards); <u>see also</u>

<u>Feld,</u> 203 B.R. at 366 (same).  Execution of a promissory note in connection with a loan also

constitutes a representation that a debtor intends to repay the obligation.  <u>See, e.g.</u>, <u>In re Dunlap</u>,

458 B.R. 301, 333-34 (Bankr. E.D. Va. 2011).

In non-dischargeability proceedings under §523(a)(2)(A) involving extensions of credit,

the second and third prong analysis is commonly collapsed into a single inquiry: did the debtor

intend to repay the obligation at the time it was incurred?  <u>See</u> <u>Ritter</u>, 404 B.R. at 825.  A

creditor seeking to except a debt from discharge must establish more than the mere fact that a

---

[21]      I need not decide the precise meaning of the term "actual fraud" under §523(a)(2)(A)
because the issue is not presented.

debtor failed to perform his repayment obligations; rather, a creditor must prove that the debtor did not intend to repay the debt at the time in which the agreement was entered. August, 448 B.R. at 350; In re Singh, 433 B.R. 139, 163 (Bankr. E.D. Pa. 2010); In re Harrison, 301 B.R. 849, 854 (Bankr. N.D. Ohio, 2003); In re Maurer, 112 B.R. 710, 713 (E.D. Pa. 1990) (citations omitted); See, e.g., In re Hammill, 61 B.R. 555, 556-57 (Bankr. E.D. Pa. 1986).

A debtor's subjective intent may be inferred by examining the totality of the circumstances because it most commonly cannot be established by direct evidence,. See e.g., Cohn, 54 F.3d at 1118-19. While relevant in considering the question of intent, a failure to repay a debt caused by mere negligence, poor business judgment, or objective inability to pay at the time the debt was incurred are not by themselves sufficient grounds for an exception from discharge under §523(a)(2)(A). See Singh, 433 B.R. at 161; See, e.g., Ritter, 404 B.R. at 826, 827; Hammill, 61 B.R. at 557.

In this case, by signing the Oppenheimer note and accepting his bonus, the Debtor made an implied representation to the firm that he intended to either remain employed there for the entire five (5) year forgiveness term, or to repay whatever obligation remained at the time of his departure. Therefore, if the Debtor knew, at the time he signed the note for the forgivable loan and his employment contract, that he neither intended to stay at Oppenheimer nor to repay whatever balance remained unforgiven when he left, any harm caused by the firm's justifiable reliance on his misrepresentations would be non-dischargeable under §523(a)(2)(A).

## IV.  DISCUSSION

### A.

This case ultimately turns upon the Debtor's intent at the time he signed the

Oppenheimer Note.  I am mindful that rarely (if ever) is it possible to ascertain conclusively a

debtor's subjective state of mind in an adversary proceeding of this kind.  In the end, in making

its decision, the court usually must assess the Debtor's credibility against the weight of the

evidence offered against him, relying largely on experience and human intuition.  See Ritter, 404

B.R. at 827.

In this case, if I find the Debtor to be credible, then his story is a whirlwind plot of bad

luck, misplaced trust, poor decision-making, culminating in a health scare that caused him to

reassess his life's priorities.  The Debtor suggests that a unique set of circumstances led to his

early departure from each firm mentioned in this case.  At each transition, the Debtor claims to

have fully intended to remain in the next firm for the full term of his five (5) year forgivable loan

only to encounter some disagreement or misdeed that forced him to leave.[22]

If I find that the Debtor is not credible and accept Oppenheimer's proposed inferences

drawn from his employment and loan repayment history, then I must believe that by the time the

Debtor signed the Oppenheimer Note, he had developed a scheme of accepting bonuses at the

---

[22]       The Debtor contends that his obligations to Raymond James and Janney were repaid in
full (albeit at a negotiated, reduced amount) and do not support an inference of a pattern of bad faith or
fraudulent conduct.  He further asserts that he honestly believed when he left both Wachovia and RBC he
had been wronged by his employer and thus had legal defenses to repayment of whatever portion of his
forgivable loan  remained "on the books."  As for Oppenheimer, the Debtor points to his stress-related
health scare, not bad faith or a preconceived intent to defraud, as the real reason for leaving prematurely.

outset of his employment with the intent of leaving early and refusing to repay whatever portions were left unforgiven.[23]

My fact finding in this case is influenced by the parties' presentation of only one witness, the Debtor, who was called by both sides to testify at trial.  While Oppenheimer disputed the credibility and weight of his testimony, Oppenheimer presented no testimonial or documentary evidence to contradict the substantive content of the Debtor's testimony.  Thus, my findings ultimately turned largely upon my assessment of the Debtor's credibility, considered within the context of the burden of proof Oppenheimer bears in asserting a fraud claim under 11 U.S.C. §523(a)(2).

In other words, both sides asked me to draw inferences from a sparse record that consists of certain undisputed historical facts and the Debtor's testimony.  The pattern in the undisputed facts regarding the Debtor's employment and loan repayment history arguably is sufficient to support a finding that the Debtor never intended to repay Oppenheimer and that the subject debt is non-dischargeable.  However, this pattern evidence was rebutted by the Debtor's testimony in which he offered innocent explanations for the apparent pattern of misconduct Significantly, while the Debtor's testimony was not supported by substantial corroborating evidence, neither was it rebutted by contrary evidence or undermined by any substantial internal inconsistencies.

---

[23]       Oppenheimer points out that the Debtor accepted four (4) such bonuses from four (4) separate employers before arriving at Oppenheimer.  Not one (1) time did he remain at a firm for the full term prescribed by his bonus or repay the full obligation after his premature departure.  Oppenheimer urges me to draw a negative inference from the Debtor's conduct regarding the Raymond James and Janney notes, whereby the Debtor left those firms early and enlisted the aid of an attorney to negotiate a reduced payment obligation.  Oppenheimer similarly contends that the Debtor's course of conduct during his period of employment with Wachovia and RBC evinces a pattern of bad faith.  The Debtor's proffered reasons for leaving those firms and failing to pay his debts are too convenient, Oppenheimer alleges, and instead are indicative of a man who never intended to fulfill his contractual obligations.

Bearing in mind that Oppenheimer bears the burden of proof in this adversary proceeding, I conclude based on this record that Oppenheimer did not establish, by a preponderance that, at the time that he signed the Oppenheimer note, the Debtor did so with the fraudulent intent of neither intending to remain at the firm long enough to have his bonus forgiven, nor repaying his loan obligation if and when he did leave.

## B.

Notwithstanding the above conclusion, I acknowledge that Oppenheimer's spin on the undisputed, historical events has some appeal.  The fact that the Debtor failed to remain with any one (1) of the five (5) firms for the full term of each forgivable loan has the appearance of a pattern of conduct.  Moreover, I am somewhat skeptical of the reasons presented by the Debtor for his premature departure from each successive firm in that certain aspects of the Debtor's recitation of the events are not entirely convincing.

For example, the four (4) reasons the Debtor gave for leaving Wachovia[24] are hard to grasp.  At least three (3) of these reasons, standing alone, do not impress me as obvious grounds for quitting a lucrative position as a stockbroker.

---

[24]    Those four (4) reasons were:

(1) the unexpected ticket charges being levied for each trade the Debtor made on behalf of his clients;

(2) the escalating pressure from managers to sell Wachovia investment products to clients;

(3) the denial of a performance bonus to the Debtor based on the 1.5% commissions-to-sales clause contained in the Debtor's employment agreement with the firm; and

(4) the e-mail between Wachovia managers recounting allegations that a client had moved his accounts to another firm after learning that the Debtor had engaged in an affair with the client's daughter.

The ticket charges were apparently levied against all Wachovia brokers.  The Debtor was aware of no exceptions to the ticket charge policy and it is difficult to understand why such a policy would be so offensive to the Debtor when every other broker at the firm operated was subject to it.  The performance bonus clause is also not obviously offensive.  The Debtor read the clause when reviewing his employment contract and even submitted the contract to his counsel for review before signing it.  Considering that the Debtor is an individual of undeniable sophistication in financial matters and that the clause referenced a significant aspect of his compensation package, it seems odd that the Debtor would neither be able to understand what the clause practically meant when he read it, nor make certain to clear up any confusion that did exist before signing.  Yet, that is exactly what the Debtor proposes.  I also struggle to understand why the Debtor took such offense to the e-mail he considered to be a false and scandalous account of his "affair" with a client.  According to the Debtor's own testimony, the e-mail essentially consisted of one manager relaying to another what still another person had said about a rumored affair.  Neither manager personally made allegations or statements about the truth of the rumors.  Even so, the Debtor claims that the very act of transcribing such scandalous accusations in an e-mail so offended him that he could not suffer the insult.

The Debtor's grounds for leaving RBC also might permit a negative inference to be drawn.  The Debtor claims that he quit RBC because he was once again wrongfully denied a performance bonus that he believed was merited by his sales record at the firm.  However, the Debtor cites as the catalyst a contract clause that is _identical_ to the one that caused him so much grief during his tenure at Wachovia.  By his own admission, the Debtor read and was aware of the 1.5% commissions-to-sales threshold provision in his employment contract before he signed the contract and commenced his employment there.  He asserts that he was told by his manager

at RBC that the clause would not be enforced and was shocked when RBC subsequently

enforced the provision and felt rebuffed by RBC's management when he complained about that

"unfair" treatment.[25]  I find the Debtor's recitation somewhat odd.  An individual as

sophisticated as the Debtor who had fallen prey to an identical provision in the past would have

to be foolhardy to knowingly sign an agreement containing such a clause a second time.  And

yet, that is exactly the story that the Debtor advances.  In fairness, however, the Debtor claimed

that by the time he became aware that the RBC employment contract contained the same

problematic provision as the Wachovia contract, he had burned his bridges at Wachovia and had

little choice but to move on to RBC and hope for the best.

Lastly, the Debtor's tale culminates in health problems involving panic attacks and back

pain, all brought on by the adverse financial consequences snowballing out of the imprudent

actions detailed above and providing the real reason for his exit from Oppenheimer.  The Debtor

offered no hospital records or doctors' notes to substantiate his factual claims on this point.

## C.

On the other hand, while the Debtor's explanations do not enjoy airtight evidentiary

support at every turn, there is an overall degree of consistency in his story.  In each instance, he

pointed to specific circumstances to support his assertion that he acted in subjective good faith in

deciding to terminate his employment before his loan was forgiven, without full repayment of

the loan.

---

[25]      If the 1.5% commissions-to-sales threshold contract provision is common in broker
employment contracts, one might wonder why the Debtor was surprised that RBC enforced the provision
in his contract.  If such provisions are not common, his version of the events is more credible.  Nothing in
the record, however, assists me in this assessment.

Beginning with the first two (2) employers, Raymond James and Janney, the Debtor did not describe the specific circumstances that led to the Debtor's departure from Raymond James or Janney.  The Debtor merely cited "disagreements" with his managers as motivating factors. However, his testimony was not challenged by Oppenheimer or controverted in any way. Moreover, Oppenheimer offered no evidence that the negotiations were conducted in bad faith. The only evidence in the record suggests that the Debtor entered these negotiations with the good faith belief that a reduction was both customary and warranted.  In addition, the Debtor actually paid these negotiated amounts in full.  This conduct tends to support an inference that the Debtor was operating with a good faith intent to repay whatever obligations stemmed from the loans.  I find nothing suspicious about the Debtor's historical account and I draw no adverse inference against the Debtor.

As for the balance of the events, as described by the Debtor, the Debtor offered a plausible account that is adequate to support his contention that he acted in subjective good faith and rebut a claim for false representations or false pretenses under §523(a)(2)(A).  The Debtor's testimony paints a picture, with specific details, of an individual who was unable to co-exist with his managers or make sound decisions in his professional life.  Most significantly though, Oppenheimer presented no evidence to contradict any of the details offered by the Debtor.

Further, the Debtor largely accounted for the manner in which each of his bonuses was spent.  The Debtor testified that he used a significant portion of his bonuses (which was commingled with his ordinary income) to pay the costs of maintaining and advancing his business, as well as to service his burgeoning personal debts.  The remainder was lost in risky day trading, an activity in which the Debtor engaged with increasing desperation as his financial situation worsened.  It may have been imprudent for the Debtor to continue to spend large

amounts of money on business expenses (for example, enlisting the services of an expensive

broker coach, even as his personal debts began to spiral out of control) and day trading,[26] but

given the plausibility of the Debtor's explanations for these expenditures and the paucity of

contrary evidence, I do not find that such behavior evinces subjective bad faith.

Nor am I convinced by Oppenheimer's argument that the Debtor's failure to use either

his RBC or Oppenheimer bonus to satisfy his obligations to Wachovia or RBC is an indication of

bad faith.  The Debtor testified that he did not subjectively believe that either the Wachovia or

RBC loan constituted enforceable obligations at the time he left those firms.  There is no

evidence in the record to cause me to question the Debtor's subjective view of his obligations to

those firms.  While it certainly would have been prudent to set aside a portion of his subsequent

bonuses to pay these disputed sums should they actually become due, the Debtor's bad judgment

is not adequate, by itself, to establish his intent to breach his contract with Oppenheimer at the

inception of their relationship.

In the end, after considering the evidence as a whole, I am not convinced that, over time,

the Debtor developed a scheme to enter into bonus/loan agreements with his employers in bad

faith, with the intent neither to remain employed at the firms long enough to have his obligations

forgiven, nor to repay any portions remaining when he did leave.  Rather, it is at least equally

likely that the Debtor's pattern of financial and professional difficulties was a manifestation of a

lack of judgment and poor interpersonal skills (enabled by the willingness of one brokerage firm

---

[26]         I do not find that the Debtor's risky trading activities while at Wachovia or RBC suggest
fraudulent intent.  The Debtor once more offered a rationale on this point.  The Debtor recognized that his
money troubles were deepening and resorted to day trading in the hope of bailing himself out.  Given the
Debtor's general success in his profession as a securities broker, I find this explanation credible.

after another to recruit him with the carrot of large signing bonuses in the form of forgivable

loans), rather than a conscious desire to defraud his employers.

Without an inference that the Debtor purposefully engaged in patterned misconduct

leading up to his employment at Oppenheimer, Oppenheimer's case falls short. It may only be a

slight exaggeration to state that this case comes down to one question: why did the Debtor leave

Oppenheimer? Oppenheimer did not generate enough evidence to persuade me to reject the

Debtor's explanation that he had good faith reasons for his failure to pay his prior forgivable

loans and that his departure from Oppenheimer was caused by health problems and the increased

financial pressure which ensued after the adverse result in the Wachovia arbitration in May

2009.[27]

Lastly, I am unpersuaded by Oppenheimer's argument that the Debtor's bad faith is

demonstrated by the fact that he left the firm very shortly after he finished spending the signing

bonus. To the contrary, the Debtor's explanation that the timing of his departure was based on

health concerns finds support in several places in the record.

---

[27]       The Debtor was not notified that he had lost his arbitration case with Wachovia until May
2009. Up until that point, the Debtor likely labored under the assumption that his financial troubles,
while not improving as he had hoped, had not passed the point of no return. It is reasonable to believe
that the bleak reality the Debtor faced after the loss of the Wachovia arbitration presented a shock to his
system and resulted in sudden and significant stress. Not only did the Debtor have to add more than
$200,000.00 to his existing debt load, but FINRA regulations threatened the suspension of the Debtor's
license and his ability to earn a living. I find his account regarding the severity and effects of the
resulting stress to be believable.

I might have accorded the Debtor's self-serving testimony reduced weight, in light of the
absence of medical records or fact witnesses to corroborate his testimony, but Oppenheimer did nothing
to question the veracity of his statements regarding his deteriorating health. In fact, Oppenheimer seemed
to concede that the Debtor did indeed have health problems, but merely urged the court to regard these
issues as factors that accelerated the Debtor's pre-conceived plans to breach his agreement with the firm.
Absent any evidence in support of Oppenheimer's theory, I cannot adopt it.

The Debtor did make significant changes in his life after resigning his position with Oppenheimer. If the Debtor actually left Oppenheimer simply because his bonus money was spent and not because he realized a need to achieve a greater work-life balance, then I would expect the record to show that the Debtor continued to live and work in the same style as he previously had. If the Debtor honestly made a transition in order to regain some measure of health and sanity, however, then I would expect the record to present some significant tangible lifestyle alterations in support of his claims. The Debtor provided credible testimony as to the pressures inherent in working at a large firm such as Oppenheimer, including: lengthy commute time, a requirement that the Debtor work from the office, set work hours, sales quotas, direct supervision of his work by managers and pressure to market specific investment products to his clients.

When the Debtor left Oppenheimer, he took a position at Gunn Allen that provided a relatively meager signing bonus, but that also relieved him of "big firm" stressors. Gunn Allen allowed the Debtor to work from home, eliminating his commute time and permitting the Debtor great flexibility in his work schedule. The Debtor was thus given more free time to spend with his children and to work at a more reasonable pace when he did work. The firm also provided the Debtor with $50,000 in bonus money to set up his own office close to his house, which reduced any commute time the Debtor elected to undertake. The Debtor was allowed to work unsupervised and free from the pressures of sales quotas and product requirements. Common-sense dictates that substantial changes or reductions in material standards of living are not easy to undertake. The fact that the Debtor actually made these changes despite the possibility of moving to another large firm suggests that his true reasons for leaving Oppenheimer most likely

stemmed from a desire to live a more stress-free life, rather than a pre-conceived sham to defraud the firm of the proceeds of the forgivable loan.

Further, the timing of the Debtor's departure from Oppenheimer actually may more strongly support the finding that he was motivated by something other than a fraudulent intent. The Debtor offered uncontroverted testimony suggesting that he was entitled to a substantial performance bonus after his one-year anniversary at Oppenheimer.[28]   The Debtor left his position at Oppenheimer after nine (9) months.  If the Debtor truly wished to engage in a "cash grab," he would have every incentive to continue his employment for the next three (3) or four (4) months until he received his annual bonus before absconding.  This option also would have allowed the Debtor to use his performance bonus to repay at least a portion of his debt to Wachovia and, in effect, buy more time.  Because the Debtor chose to leave Oppenheimer in such close temporal proximity to another bonus award, I find that the timing of his departure actually supports the Debtor's defense.

For all of the foregoing reasons, I decline to infer that the Debtor's pattern of accepting a bonus structured as a forgivable loan from prior employers, only to leave their employ before the agreed-upon employment term had run without full repayment of the loan obligations is indicative of a conscious, pre-conceived intent to defraud at the time he was hired by Oppenheimer.  Instead, I credit the Debtor's testimony that he experienced stress-related health problems that prompted him to leave Oppenheimer and to seek employment at a firm that would allow him to improve his work-life balance.

---

[28]     Once more, while the Debtor did not introduce his Oppenheimer employment agreement to support this factual contention, Oppenheimer did not dispute him on this point.

## VI.  CONCLUSION

For the reasons stated above,  I find that Oppenheimer has not established by a

preponderance of the evidence that, at the time he signed the Oppenheimer Note, the Debtor

knowingly made a false representation regarding his subjective intent either to remain employed

at the firm for five (5) years, or to repay the unforgiven loan balance.  Therefore, the Debtor's

$349,652.00 debt to Oppenheimer is dischargeable.   An appropriate order will be entered.


**Date:  July 19, 2012**

_____
**ERIC L. FRANK**
**U.S. BANKRUPTCY JUDGE**